Ronni RABIN, individually and as a representative of all persons similarly situated, Maritza Avila, individually and as a representative of all persons similarly situated, Jane Doe, Ronald Green, individually and as representatives of all persons similarly situated, Wende Qallab, individually and as a representative of all persons similarly situated, Plaintiffs–Appellants,

v.

Patricia WILSON–COKER, in her official capacity as Commissioner of the Connecticut Department of Social Services, Defendant–Appellee.

No. 03–7572.

United States Court of Appeals, Second Circuit.

Argued: Aug. 4, 2003.

Decided: March 26, 2004.

Shelley A. White, New Haven Legal Assistance Assoc., Inc., New Haven, CT (Joanne G. Gibau, New Haven Legal Assistance Assoc., Inc., New Haven, CT; Sharon Langer, Connecticut Legal Services, New Britain, CT; Lucy Potter, Greg Bass, Greater Hartford Legal, Hartford, CT, on the brief), for Plaintiffs–Appellants.

Hugh Barber, Assistant Attorney General (Richard Blumenthal, Attorney General, Richard J. Lynch and Tanya Feliciano, Assistant Attorneys General, on the brief), Hartford, CT., for Defendant–Appellee.

Before: POOLER, SACK, and WESLEY, Circuit Judges.

POOLER, Circuit Judge.

Congress has determined that parents who receive Medicaid should enjoy a temporary grace period before having their benefits terminated when their earned income would otherwise make them ineligible. The question we face is whether the grace period only applies when the parent is fortunate enough to get a job or receive a salary increase that triggers ineligibility, or if the grace period also applies when a state lowers its income eligibility limits, making a working parent who has not received an increase in her salary ineligible.

The statute central to this appeal, 42 U.S.C. § 1396r–6, provides that families who were eligible for Aid to Families With Dependent Children ("AFDC"), a former welfare program, "in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for such aid, because of hours of, or income from, employment of the caretaker relative," will remain eligible for Medicaid for a period of up to a year. *See* 42 U.S.C. § 1396r–6(a)(1), (b)(1). Each of the individual plaintiffs has earned income and was terminated from Medicaid when Connecticut enacted a statute reducing its Medicaid eligibility limits. *See* 2003 Conn. Acts § 03–02 § 10(g) (Reg.Sess.). Connecticut contends that the transitional medical assistance ("TMA") benefit is unavailable to plaintiffs because they lost their eligibility due to the new income limits and not due to income from employment. After reviewing the statutory scheme, the legislative history of the TMA provision and its purposes, and the relevant cases, we conclude that plaintiffs lost their eligibility for Medicaid because of "income from employment" within the

meaning of the federal statute and therefore remain eligible for TMA.

### The Statutory Framework

Prior to April 1, 2003, Connecticut allowed families with income levels up to 150% of the federal poverty level to participate in HUSKY A, a state Medicaid program. Connecticut achieved this result by not counting income between its AFDC eligibility levels and 150% of the federal poverty level. In 2003, the Connecticut legislature enacted P.A. 03–02, which provided that parents and other needy caretaker relatives would not be eligible for TMA if their incomes exceeded 100% of the federal poverty level. 2003 Conn. Acts § 03–02 (Reg.Sess.). The legislature further directed that the Medicaid assistance for newly ineligible caretaker relatives would end on April 1, 2003.[1] *Id.* Defendant Patricia Wilson–Coker, Commissioner of the Connecticut Department of Social Services, issued termination notices to approximately 23,000 adult Medicaid recipients informing them that their Medicaid benefits would end on April 1, 2003, because their household incomes exceeded 100% of the federal poverty level.

Connecticut's actions took place against the background of a Byzantine tangle of federal statutes, any one of which is difficult to decipher if read either independently of the history of the program or in isolation from other provisions of the Medicaid Act. We therefore undertake a brief description and history of the Medicaid program, created in 1965.

Medicaid is a joint federal-state program under which the federal government pays a portion of a state's expenses for providing medical assistance to persons who are unable to afford insurance provided that the state's plan for granting assistance has been approved by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services ("HHS"). *Rodriguez v. City of N.Y.,* 197 F.3d 611, 613 (2d Cir.1999). In order to win approval from CMS, the state plan must comply with the requirements of the Medicaid Act, 42 U.S.C. § 1396 et seq., and its implementing regulations. *Wisconsin Dep't of Health and Family Servs. v. Blumer,* 534 U.S. 473, 479, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002).

Medicaid eligibility is categorical. To receive benefits, applicants must show both that they are needy and that they fall into one of the many categories set forth in 42 U.S.C. § 1396a(a)(10)(A). Until Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), two of the most significant eligibility categories were families who received AFDC, a cash assistance program for families with dependent children, and families with dependent children who would be eligible for AFDC if it were not for income and resources and who meet state income eligibility standards for Medicaid. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i)(I), 1396a(a)(10)(C), 1396d(a)(i),(ii).

PRWORA abolished the AFDC program and established a new cash assistance program for families, Temporary Assistance to Needy Families ("TANF"). *See* 42 U.S.C. § 601 et. seq. Nevertheless, Congress continued to define eligibility by reference to the former AFDC program. *See* 42 U.S.C. § 1396(a)(10)(A), (C). Congress resolved the apparent inconsistency of defining categorical eligibility by reference to the repealed AFDC program by enacting 42 U.S.C. § 1396u–1, which provides that

---

**1.** According to the state, no children lost Medicaid eligibility pursuant to the new law because they are covered under another Medicaid program.

for purposes of PRWORA's TMA provision, a person will "be treated as receiving aid or assistance" under AFDC, the repealed program, if she meets income and resource standards and other eligibility requirements in effect in 1996. 42 U.S.C. § 1396u–1(b)(1)(A). Congress also gave the states the option of creating either higher or lower income limits within the following parameters: (1) the income level could be no lower than the level in effect under the 1988 state plan; (2) income and resource levels could be increased "by a percentage that does not exceed the percentage increase in the Consumer Price Index for all urban consumers"; and (3) the states could change their methods for counting income and resources to make those methods "less restrictive" than the 1996 methods. 42 U.S.C. § 1396u–1(b)(2). As we have seen, Connecticut originally chose the third option and thereby created a generous program for its needy families.

The TMA program also has a long history. In 1972, Congress provided that families who became ineligible for AFDC due to "increased income from employment" would remain eligible for Medicaid for four months. Pub.L No. 92–603 § 209, 86 Stat. 1329 (1972) (codified as amended at 42 U.S.C. § 1396a(e)(1)(A)). In 1984, the Eighth Circuit considered the meaning of Section 209's reference to "increased income from employment." *Phillips v. Noot,* 728 F.2d 1175, 1177 (8th Cir.1984). The *Phillips* plaintiffs had been terminated from AFDC—and Medicaid—because they were no longer eligible for an income disregard that allowed AFDC recipients to keep the first thirty dollars and an additional one-third of their earned income. *Id.* at 1176–77. Their incomes had not increased. *Id.*

The Eighth Circuit found Section 209's TMA language ambiguous because "increased income from employment" could

refer either to actual income from employment or to income that was countable under the applicable eligibility standards. *Id.* at 1177. Thus, the court turned to the legislative history of the TMA statute and found that "[t]he clear primary purpose of the provision was to remove a work disincentive: loss of Medicaid benefits" and that a secondary purpose was preventing "sudden loss of medical care." *Id.* Although the court also acknowledged that the purpose of limiting the earned income disregard "was undoubtedly to cut federal spending," it found this purpose irrelevant to construing the language of the separate statutory provision authorizing TMA, explaining that "[t]he fact that in 1981 Congress sought to cut the budget in no way imposes a general rule that all statutes involving expenditures must be construed in favor of spending less." *Id.* at 1178.

The *Phillips* court also rejected HHS's interpretation of the TMA provision, which supported the state, because it was "not based on long-standing policy," had not "been the subject of administrative adjudication or rulemaking," and was not "supportive of the congressional purpose" of the TMA provision. *Id.*

The court held: "Even though ... Congress may not have envisioned the precise situation which exists here and now, we find the legislative history to tip the balance in favor of plaintiffs' position. We therefore conclude that the term 'income' in [the TMA provision] means 'countable' income." *Id.*

In probable reaction to *Phillips,* Congress added a new section to the AFDC statute which granted families who lost AFDC as a result of the expiration of the thirty and one-third disregard a minimum of nine months of transitional Medicaid. Pub.L. 98–369 § 2624, formerly codified at 42 U.S.C. § 602(a)(37)(1985). This section

effectively adopted the specific holding of *Phillips* and extended its duration.

Four years later, Congress adopted 42 U.S.C. § 1396r–6 and suspended the operation of Section 1396a(e)(1)(A) for as long as Section 1396r–6 remains in effect. *See* Pub.L. No. 100–485 § 303, 102 Stat. 2385; 42 U.S.C. § 1396a(e)(1)(B). Section 1396r–6 dropped Section 1396a(e)'s reference to "increased" income. *See id.* Section 1396r–6 provides:

**Extension of eligibility for medical assistance**

**(a) Initial 6–month extension.**

**(1) Requirement.**

Notwithstanding any other provision of this subchapter, each State plan approved under this subchapter must provide that each family which was receiving aid pursuant to a plan of the State approved under [the AFDC requirements] in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for such aid, because of hours of, or income from, employment of the caretaker relative ... or because of section 602(a)(8)(B)(ii)(II) of this title (providing for a time-limited earned income disregard), shall ... remain eligible for assistance under the plan ... during the immediately succeeding 6–month period. . . .

Section 1396r–6(b) provides for an additional six-month extension as long as the recipient complies with certain reporting requirements.

TMA next resurfaced in 1996 as part of PRWORA. 42 U.S.C. § 1396u–1(c)(2) states:

For continued medical assistance in the case of individuals (and families composed of individuals) described in subsection (b)(1)(A) of this section who would otherwise become ineligible because of hours or income from employment, see sections 1396r–6 and 1396a(e)(1) of this title.

Because Section 1396a(e)(1)(B) suspends Section 1396a(e)(1)(A)'s operation with respect to individuals and families who become ineligible for aid between April 1, 1990, and September 30, 2003, as did plaintiffs, Section 1396r–6 is the sole applicable section for determining plaintiffs' TMA eligibility.

### District Court Proceedings

On March 28, 2003, the appellants and two additional plaintiffs, who had no income from employment, filed a civil rights complaint in the United States District Court for the District of Connecticut. Their claims included one based on defects in the notice of termination and another alleging violation of 42 U.S.C. §§ 1396r–6(a)(1) and 1396u–1(c)(2). On the same day, plaintiffs requested preliminary injunctive relief and class certification. Based on the uncontested allegation "that the notice of termination mailed to affected individuals on or about March 10 is defective," Chief Judge Chatigny granted a temporary restraining order.

On April 14, 2003, Wilson–Coker moved for summary judgment on plaintiffs' claim that they were entitled to TMA under Sections 1396r–6(a)(1) and 1396u–1(c)(2). She principally argued that plaintiffs are not eligible for TMA because their terminations resulted from reduced eligibility levels rather than "income from employment."

Chief Judge Chatigny dismissed plaintiffs' complaint, finding that plaintiffs were not terminated from Medicaid because of income from employment. *Rabin v. Wilson–Coker*, 266 F.Supp.2d 332, 335, 340 (D.Conn.2003). The judge first found that the phrase "income from employment" was ambiguous because

[i]t could apply to plaintiffs, who cease to be eligible because their income exceeds the new HUSKY A income eligibility limit established by Public Act 03–02. Alternatively, it may apply only if the triggering event causing a loss in eligibility is an increase in income, a condition that was explicitly stated in the predecessor statute to §§ 1396u–1(c)(2) and 1396r–6.

*Id.* at 338 (footnote omitted).

He therefore considered the legislative history of PRWORA, which as we have seen reenacted the TMA program without change. *See id.* at 339–40. Because this history repeatedly references "increased income" from employment, Judge Chatigny found it to be supportive of Wilson–Coker's interpretation. *Id.* at 339. In light of the repeated mention of increased income in the 1996 PRWORA legislative history, the judge did not attribute significance to Congress's 1988 deletion of the word "increased" from the TMA provision. *Id.*

Judge Chatigny also found that defendant's reading of the statute best served the legislative purposes of PRWORA: "to (1) provide healthcare to the most needy, (2) control healthcare expenditures, (3) provide states with maximum flexibility in designing Medicaid programs, and (4) protect states from unanticipated costs resulting from changes in the business cycle." *Id.* at 340. In addition, he found defendant's interpretation to be "consistent with the main purpose of TMA, which is to assure people that if they go to work, or their salaries increase, they will not lose their health insurance coverage." *Id.* He reasoned that although "[i]t is possible that when a state lowers an income eligibility limit to reduce Medicaid expenditures, some of the affected individuals may stop working to avoid losing benefits, … there is no indication Congress intended to require states confronted with budget deficits to provide TMA to persons in that situation in order to encourage them to keep working." *Id.*

Finally, he relied on CMS's interpretation of the statute to protect only those recipients who become ineligible due to increased earned income. *Id.* Despite the tentative nature of this interpretation, he found that it "still give[s] the best indication of how CMS interprets the statute." *Id.*

Judge Chatigny therefore granted summary judgment to defendant and denied plaintiffs' motion for injunctive relief. He did not rule on plaintiffs' class certification motion.

Those plaintiffs whose households receive earned income from employment filed a timely notice of appeal limited to the district court's interpretation of Section 1396r–6. On appeal, they principally argue that the district court erred by finding "income from employment" ambiguous and thus resorting to sources other than the statutory language. They also contend, however, that the legislative purposes of the TMA statute are consistent with its plain language and that the district court improperly relied on advisory portions of CMS's State Medicaid Manual. Defendants defend the district court's reasoning but also urge affirmance on three alternative bases: (1) pursuant to 42 U.S.C. § 1396r–6(f), a sunset provision, the TMA program ended on September 30, 2002; (2) defendants were under no obligation to provide TMA to plaintiffs or others with income above 1996 AFDC standards; and (3) Sections 1396r–6 and 1396u–1 do not give individual Medicaid recipients a right to sue under 42 U.S.C. § 1983.

Prior to oral argument, plaintiffs requested and were granted an injunction pending appeal barring Wilson–Coker

from ending Medicaid coverage for the individual plaintiffs or the plaintiff class "based on the statutory rights contested on appeal." On January 23, 2004, Wilson–Coker requested that we vacate the injunction or expedite consideration of the appeal.

## DISCUSSION

### I. The ambiguity of Section 1396r–6.

■ A statute is ambiguous if its terms are "susceptible to two or more reasonable meanings." *Natural Res. Def. Council v. Muszynski*, 268 F.3d 91, 98 (2d Cir.2001). We determine whether a statutory provision is ambiguous "by examining its language, the context in which the language is used, and the broader context of the statute as a whole." *Freier v. Westinghouse Elec. Corp.*, 303 F.3d 176, 197 (2d Cir.2002), *cert. denied*, 538 U.S. 998, 123 S.Ct. 1899, 155 L.Ed.2d 824 (2003).

■ Wilson–Coker argues that the statute implicitly requires increased income because if the recipient's earned income does not change, the termination results from something other than the recipient's earned income. She contends that plaintiffs were terminated "because of" the lowered income disregards rather than "because of earned income." She also argues that because some plaintiffs have income from sources other than employment, we must determine whether income from employment has to be a "but for" cause of the termination. Finally, she suggests that the word "increased" would be redundant in the statute because only an increase in income will trigger ineligibility assuming that income limits remain the same.

Plaintiffs, on the other hand, contend that Congress's deletion of the word "increased" before "income" means that if earned income plays a role in causing ineligibility for AFDC, TMA is available even if the recipient has experienced no change in his earned income. They cite *White v. Martin*, No. 02–4154–CV–C–NKL (W.D.Mo.2002), which, relying on *Phillips*, found that the TMA provision unambiguously confers TMA eligibility on caretaker relatives who become ineligible for AFDC because their unchanged earned income places them above new income eligibility limits. Slip op. at 12–13.

Notwithstanding *White*, reading Section 1396r–6 without reference to its history or its purpose requires us to conclude that it is ambiguous. We believe that a reasonable reader could read this section either as mandating an extension of benefits whenever earned income plays a role in a recipient's termination or as requiring that earned income—rather than a change in eligibility standards—be the primary cause for the termination.

### II. Applying the canons of construction.

■ Where a statute is ambiguous, we must look to the canons of construction. *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 143 (2d Cir.2002). At least three such canons are relevant in this case. First, "a statute is to be considered in all its parts when construing any one of them." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 36, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998). If drafters choose to use one word in part of a statute and omit it in another, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (internal quotation marks omitted). Second, we must give "some significant measure of deference to CMS's interpretation of the statute." *Community Health Ctr. v. Wilson–Coker*, 311 F.3d 132, 137 (2d Cir.2002). Third, the interpretation given

to the statute must be consistent with the congressional purpose for enacting it. *Holloway v. United States,* 526 U.S. 1, 9, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999).

The first canon—an examination of how the statute in all of its parts fits together—favors plaintiffs' interpretation of Section 1396r-6. However, the section we must examine to understand the relevance of this canon is not Section 1396r-6 itself, but rather Section 1396a(e). Subsection (1)(a) of Section 1396a(e) provides that recipients who have become "ineligible for [AFDC] because of increased hours of, or increased income from, employment, shall, while a member of such family is employed, remain eligible for [Medicaid] assistance ... for 4 calendar months." Subsection (1)(B), however, instructs that Subsection (1)(A) does not apply to persons who become ineligible for AFDC from April 1, 1990, to September 30, 2003. For these recipients, the agency must use Section 1396r-6. 42 U.S.C. § 1396a(e)(1)(B). Section 1396r-6(a)(1), of course, requires only that the recipient's ineligibility be caused by "income from employment." Congress's inclusion of "increased" in the temporarily suspended section, and its cross-reference to Section 1396r-6(a), which deleted the word "increased," in the immediately succeeding portion of the statute, strongly suggests that the omission in Section 1396r-6(a) was deliberate and meaningful.

The administrative interpretation of Section 1396r-6, on the other hand, favors defendant. CMS has stated or implied in several different sources, none of which is a published regulation, that the recipient must have increased his income in order to be eligible for TMA. *See, e.g.,* CMS State Medicaid Manual §§ 3308.4, 3308.13; CMS letter of June 5, 1998, to State Medicaid Directors and TANF Administrators, at 2;

Health Care Financing Administration[2] State Plan Preprint HCFA–PM 91–4, at 2–A (August 1991). As we have said, such informal interpretations merit "some significant measure of deference." *Community Health Ctr.,* 311 F.3d at 137.

Wilson–Coker, however, seeks a heightened and all but conclusive deference to CMS's interpretation based on Congress's re-adoption of the TMA without change within PRWORA after CMS adopted its interpretation of Section 1396r-6. We presume that Congress is "aware of an administrative or judicial interpretation of a statute and [has adopted] that interpretation when it re-enacts a statute without change." *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978). However, Wilson–Coker's reliance on this principle is misplaced for two reasons. First, each of the cases she cites involves a published regulation, a consistent judicial interpretation, or an administrative interpretation of which Congress actually was aware. *See id.* (consistent judicial interpretations); *Utah v. Evans,* 536 U.S. 452, 454, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002) (Congress actually aware of Census Bureau's long-standing interpretation of statute); *Bragdon v. Abbott,* 524 U.S. 624, 631–32, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (published regulations); *Connecticut Dep't of Income Maint. v. Heckler,* 471 U.S. 524, 531–32 & n. 17, 105 S.Ct. 2210, 85 L.Ed.2d 577 (1985) (published regulations consistent with earlier less formal interpretations). We find no support in the cited cases for the proposition that we should assume Congress's awareness of an administrative interpretation that does not result from notice and comment rulemaking.

Second, the *Lorillard* principle—even assuming it should be applied to adminis-

---

**2.** The Health Care Financing Administration was CMS's predecessor.

trative interpretations that are not contained in published regulations and where there is no proof of Congressional awareness—would have much less significance in this situation because the administrative interpretation co-existed with and post-dated a conflicting judicial interpretation. By the time CMS articulated its interpretation of the current TMA provision, the Eighth Circuit already had construed "increased income from employment" to mean increased countable income from employment. *See Phillips*, 728 F.2d at 1178. Congress then (1) adopted *Phillips'* specific holding in Public Law 98–369 and (2) in 1988, deleted "increased" before "income from employment" in the TMA provision. This history suggests much more strongly that Congress was aware of *Phillips* and adopted its bottom-line conclusion that it is increased "countable" income from employment, rather than increased "actual" income from employment, that triggers TMA eligibility than it suggests Congressional awareness and adoption of the CMS interpretation.

Despite our rejection of Wilson–Coker's argument for *Lorillard* deference, we must still accord the CMS interpretation "considerable deference," with the exact degree of deference depending upon "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments." *Community Health Ctr.*, 311 F.3d at 138 (citing *United States v. Mead Corp.*, 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). CMS, the agency charged with administering Medicaid, has acknowledged expertise in this area and its position has been consistent at least since 1991, when it promulgated the pre-printed form. The formality of CMS's interpretation is at an intermediate level between a published recommendation and an inter-

pretation advanced only in litigation. However, there is no indication in the record of the process through which CMS arrived at its interpretation. Most significantly, there is no suggestion that CMS took into account the Eighth Circuit's view that—in light of the purposes of the TMA provision—it must be construed to include an increase in countable income even in the absence of an increase in actual income. *See Phillips*, 728 F.2d at 1178. Therefore, we cannot say with confidence that CMS's interpretation came about as the result of a reasoned process. In fact, CMS labels its interpretation as "tentative." CMS State Medicaid Manual § 3308.1. We therefore conclude that we will accord CMS's interpretation that degree of deference it reasonably deserves in light of the other canons of interpretation.

The district court found that CMS's interpretation best served the statutory purposes of PRWORA. *Rabin*, 266 F.Supp.2d at 340 (citing H.Rep. No. 104–651, at 1351–52, *reprinted in* 1996 U.S.C.C.A.N. 2183, 2410–11). PRWORA, however, neither created nor amended the TMA program; it simply continued it. Therefore, the purposes of PRWORA are not particularly relevant to interpreting Section 1396r–6. *Cf. Phillips*, 728 F.2d at 1178 (rejecting relevance of Act that limited the thirty and one-third disregard to four months—even though its primary purpose was to cut federal spending—because the Act "did not expressly modify § 1396a(e)(1), and we are unwilling to assume it was modified by implication").

According to the *Phillips* court, the purposes of the original TMA provisions were "to prevent sudden loss of medical care" and "to remove a work disincentive." *Id.* at 1177. In 1988, when Congress amended the TMA provision to delete the word "increased," the House Report described its purposes as follows:

The Committee amendment ... has three basic purposes. First, the amendment is intended to encourage families receiving both Medicaid and cash assistance under [the AFDC program] to work and to remain at work. The amendment would assure continued Medicaid or alternate health care coverage for these mothers and children for 24 months from the time they lose AFDC benefits because of earnings or increased hours of employment, so long as they continue working. Secondly, the amendment is intended to reduce the number of working poor families with no health care coverage. Finally, the amendment is designed to complement and encourage existing State efforts to make health care coverage available to the uninsured.

H. Rep. 100–159, at 11. These purposes are consistent with the original purposes of the TMA program and further demonstrate Congress's commitment to providing a soft landing in the form of transitional medical coverage for those recipients who suddenly become ineligible for AFDC because of earned income.

The district court found that construing TMA not to apply when new income limits cause a recipient's ineligibility might motivate some parents to leave work, but that it could not assume that Congress wanted to prevent states from immediately enforcing new income limits during a fiscal crisis. *Rabin,* 266 F.Supp.2d at 340. In doing so, the district court weighed one of TMA's two identified purposes against the purposes of PRWORA. As we have indicated, we doubt the relevance of PRWORA's purposes in interpreting TMA. In addition, it is clear to us that both of Congress's purposes for creating and then liberalizing the TMA program are served by plaintiffs' interpretation and disserved by defendant's. Connecticut's abrupt termination of plaintiffs' medical insurance clearly contravened the second of the two purposes we have identified because it did not provide plaintiffs with a soft landing. Second, to an extent that is not knowable by us or by the district court, the elimination of medical coverage removes an incentive to work, and in the case of persons with serious illnesses may indeed prevent them from working altogether. Thus, we conclude that the purposes of the TMA provision clearly support plaintiffs' position.

Arriving at this conclusion affects our analysis in two ways. First, the statutory purpose canon suggests that Section 1396r–6 applies where earned income plays a role in causing a recipient's ineligibility. Second, the inconsistency of CMS's interpretation with the statutory purposes significantly undermines its persuasiveness.

### III. Legislative history.

In addition to examining the canons of statutory interpretation, we may also look to legislative history to determine the intent of an ambiguous statute. *Auburn Hous. Auth.,* 277 F.3d at 144. Wilson–Coker relies primarily on references in the Senate, House, and Conference reports for the Family Support Act to "increased earnings from employment" as the triggering factor for TMA eligibility. *See, e.g.,* S.Rep. No. 100–377, at 42–43, *reprinted in* 1988 U.S.C.C.A.N. 2776, 2819–20; H. Conf. Rep. No. 100–998, at 169, reprinted in 1988 U.S.S.C.A.N 2879, 2957. We agree that these references support Wilson–Coker's interpretation. If they existed in isolation, they likely would persuade us of the correctness of her argument.

In our view, however, the most important aspect of the legislative history of the Family Support Act's amendment of the TMA provision is its deletion of the word "increased" as a qualifier of "income

from employment" after the Eighth Circuit's construction of "increased income" to mean "increased countable income." Congress could have easily amended the TMA provision to make clear that only an increase in actual earned income would trigger eligibility for TMA. Congress's failure to do so—and indeed its enactment of an amendment supportive of the Eighth Circuit's interpretation—suggests that it wished to adopt the Eighth Circuit's interpretation. The decision to delete "increased" from the statute trumps references to "increased income from employment" in the legislative committee proceedings. It may well be that legislators anticipated that the most common eligibility event for TMA would be an increase in earned income that caused a disqualification for AFDC. However, if Congress had intended to limit TMA eligibility to that category only (becoming disqualified for AFDC as a result of increased earned income), it need not have changed the statute, but it did.

■ Despite some legislative history and an administrative interpretation to the contrary, we conclude that plaintiffs' interpretation of Section 1396r–6 is more consistent with the legislative purpose for enacting TMA than is defendant's interpretation. As discussed previously, plaintiffs' interpretation also is the more logical one when considering the statute as a whole. Finally, the most important aspect of the legislative history—Congress's deletion of the word "increased"—strongly supports plaintiffs' interpretation. We therefore conclude that Medicaid recipients who cease to be eligible because the state has promulgated lower income limits are eligible for TMA if they (1) have earned income and (2) would not have been ineligible under the new income limits if they had only unearned income.

## IV. Wilson–Coker's alternative arguments.

### A. 1996 AFDC limits.

Based on Section 1396u–1(c)(2), Wilson–Coker argues that plaintiffs are not eligible for TMA because they are not eligible for AFDC using 1996 income eligibility levels. Section 1396u–1(c)(2) provides: "For continued medical assistance in the case of individuals (and families composed of individuals) described in subsection (b)(1)(A) of this section who would otherwise become ineligible because of hours or income from employment, see sections 1396r–6 and 1396a(e)(1) of this title." Subsection (b)(1)(A) specifically references only the 1996 AFDC limits. Wilson–Coker's argument has merit only if we ignore the introduction to subsection (b)(1), which states that the entire section is "subject to paragraphs (2) and (3)." Paragraph (2) allows the state to use eligibility requirements less restrictive than those in effect in 1996. As the Eighth Circuit recently held, the introductory language of (b)(1) incorporates the alternative methodologies by reference. *See Kai v. Ross*, 336 F.3d 650, 654 (8th Cir.2003). When a state decides to use less restrictive requirements, those requirements are deemed to be the requirements of subsection (b)(1)(A).

### B. The sunset provision.

Wilson–Coker also argues that TMA went out of existence on September 30, 2002, pursuant to 42 U.S.C. § 1396r–6(f). That section, however, was amended so that only those families who became ineligible for AFDC after September 30, 2003, are ineligible for TMA. In addition, Kevin Loveland, Director of Family Services for the Connecticut Department of Social Services, conceded that Connecticut continued to provide TMA for families during the period after September 30, 1992, and

before the amendment "on the basis of communications" that the Department received from HHS. The Department continued to receive federal reimbursement for these expenditures. Finally, the parties agree that there has been a series of continuing resolutions allowing continued expenditures, although Wilson–Coker claims that these resolutions did not affect the sunset provision. Wilson–Coker thus has not established that the TMA program went out of existence on September 30, 2002.

### C. The individual rights argument.

Defendant's final argument is that Sections 1396r–6 and 1396u–1 do not create individual rights enabling plaintiffs to sue under Section 1983. In large part, this argument relies on *Gonzaga Univ. v. Doe*, 536 U.S. 273, 276, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), in which the Court determined that a provision of the Family Educational Rights and Privacy Act ("FERPA") was not designed to convey rights on individual plaintiffs and thus did not justify a suit under Section 1983. *See also Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 786 (2d Cir.2002). In *Gonzaga*, the Court held that "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983." 536 U.S. at 284, 122 S.Ct. 2268. "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Id.* (quoting *Cannon v. University of Chi.*, 441 U.S. 677, 692 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

The *Gonzaga* Court applied this standard to the relevant section of FERPA, which provides:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein ...) of students without the written consent of their parents to any individual, agency, or organization.

*Id.* at 279, 122 S.Ct. 2268 (quoting 20 U.S.C. § 1232g(b)(1)). The Court found the FERPA provision's focus to be "two steps removed from the interests of individual students and parents." *Id.* at 287, 122 S.Ct. 2268. That is, the statute only forbade the government from funding schools that demonstrated "a policy or practice" of disclosing student records. Consequently, the court found that the provision did not create individual rights. *Id.*

■ Section 1396u–1 merely cross-references Section 1396r–6, so it is to the latter section we must turn in assessing whether Congress intended to give Medicaid recipients enforceable rights. Subsection (a) of Section 1396r–6 provides that "each State plan approved under this subchapter must provide that each family which was receiving [AFDC] in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for such aid, because of ... income from employment ... remain eligible for assistance under the plan ... during the immediately succeeding 6–month period." This language focuses much more directly than does the FERPA provision on the individual's entitlement. In particular, it contains no qualifying language akin to FERPA's "policy or practice."

Section 1396r–6(a), however, does require the State Plan to provide that eligible applicants receive aid rather than directly requiring that all eligible persons receive the assistance. Wilson–Coker contends that this wording indicates that, as in *Gonzaga*, Congress focused on the aggregate requirement and the responsibilities of the various administrative actors

rather than on the rights of the recipients. This argument fails because Congress has provided that "[i]n an action brought to enforce a provision of this chapter [which includes the Medicaid statutes], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a-2.[3] Section 1320a-2 precludes defendant from relying on the plan requirement language of Section 1396r-6.

Because all of the language of Section 1396r-6 except the "plan requirements" language, reflects Congress's intention to confer a right to TMA upon persons who meet the various eligibility requirements, we find that Section 1396r-6 can support a Section 1983 claim. The only relevant post-*Gonzaga* precedent from the Courts of Appeals supports this holding. *See Gean v. Hattaway*, 330 F.3d 758, 772–73 (6th Cir.2003) (finding that Medicaid recipients may bring a Section 1983 action for breach of the Medicaid Act's fair hearing provision assuming that they failed to receive complete and adequate medical benefits); *Bryson v. Shumway*, 308 F.3d 79, 88–89 (1st Cir.2002) (holding that Section 1396a(a)(8), which requires that state Medicaid plans provide that medical assistance "shall be furnished with reasonable promptness to all eligible individuals" supports a Section 1983 claim). *Cf. Wilder v. Virginia Hosp. Assoc.*, 496 U.S. 498, 501–02, 512, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (holding that 42 U.S.C. § 1396a(a)(13)(A), which requires states to make reasonable reimbursement to providers, was enforceable by the providers pursuant to Section 1983); *Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d

136, 143–44 (2d Cir.2001) (holding prior to *Gonzaga* that Medicaid provision requiring nursing facilities to provide certain services was intended for the benefit of the recipients and not for the benefit of the facilities).

## CONCLUSION

For the reasons we have discussed, we reverse the decision of the district court. We remand for entry of summary judgment in favor of plaintiffs establishing that Section 1396r-6 requires the provision of TMA to those persons in receipt of earned income who are discontinued because—under new eligibility provisions enacted by the state—their earned income causes them to become ineligible for AFDC. We do not hold that individuals who would be ineligible for AFDC under new eligibility standards even if they had no earned income are eligible for TMA. We remind the parties that neither our prior injunction nor this decision requires defendant to continue granting Medicaid to recipients who have exhausted their eligibility, or to recipients whom defendant deems ineligible for TMA for reasons other than the interpretation of the TMA statute she has defended on this appeal. Finally, Wilson-Coker's post-argument motion is denied as moot.

---

**3.** This section was enacted to overrule in part *Suter v. Artist M.*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), which held a provision of the Adoption Act to be unenforceable by a private person in part because the provision merely required the States to have a plan in effect containing the provision. 503 U.S. at 358–59, 112 S.Ct. 1360.