# United States Court of Appeals
## For the First Circuit

No. 04-1526

RIO GRANDE COMMUNITY HEALTH CENTER, INC.; CONCILIO DE SALUD
INTEGRAL DE LOIZA, INC.; Dr. JOSE S. BELAVAL, INC.,

Plaintiffs, Appellees,

v.

JOHNNY RULLAN, Secretary of the Department of Health, Puerto
Rico,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

Eduardo A. Vera-Ramírez, with whom Eileen Landron Guardiola,
Ivette M. Berrios Hernandez, and Landrón & Vera, LLP were on brief,
for appellant.
James L. Feldesman, with whom Feldesman Tucker Leifer Fidell,
LLP was on brief, for appellee Concilio de Salud Integral de Loiza,
Inc.

February 14, 2005

**LYNCH**, <u>Circuit Judge</u>. This case raises two issues of importance to the administration of Medicaid funds for medically underserved populations. The first is whether the health centers serving those populations have enforceable rights to sue, under 42 U.S.C. § 1983, to obtain an injunction requiring that monies (called wraparound payments) be paid as they become due. The second is how a federal court hearing such a prospective claim should proceed when parallel litigation is proceeding in a state court, seeking damages for past overdue payments and other relief. Of course, due to the Eleventh Amendment to the United States Constitution, suits for such past damages may often only be brought in state court. And so, in the world of Medicaid payments, such parallel suits are not uncommon.

Here, the Secretary of Health for the Commonwealth of Puerto Rico, Johnny Rullan, appeals from the grant of a preliminary injunction that forced him to make a prospective interim Medicaid reimbursement payment to the plaintiff health center, Concilio de Salud Integral de Loiza, Inc. ("Loiza"), for the first quarter of 2005.[1] It is undisputed that the Secretary has not, to date, been in compliance with the special Medicaid reimbursement requirements applicable to federally-qualified health centers (FQHCs) like Loiza, which provide care to medically underserved populations. 42

---

[1] The other plaintiffs to this federal action, Rio Grande Community Health Center and Dr. Jose S. Belaval, Inc., are not parties to this appeal.

U.S.C. §§ 1396a(bb). As a result of the Secretary's noncompliance with these requirements, the plaintiff Puerto Rico FQHCs alleged they were experiencing financial problems and Loiza, in particular, alleged that it was facing imminent foreclosure and bankruptcy. The Secretary did not seriously deny this.

Nonetheless, the Secretary argues that the preliminary injunctive relief given here was inappropriate. He argues that (1) the district court should have abstained, under Younger v. Harris, 401 U.S. 37 (1971), from granting relief, because of a pending local court action on similar issues; (2) there is no action to enforce the relevant provisions of the Medicaid law under 42 U.S.C. § 1983; and (3) the district court otherwise abused its discretion in granting the injunction because relief was moot and for other reasons.

We affirm. Younger does not apply to the sort of ongoing local court action at issue here. The exceptional circumstances necessary for abstention due to the mere presence of a parallel state court action, under Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976), are absent. There is an implied action under section 1983 to enforce the special provisions of the Medicaid law dealing with FQHC reimbursement, 42 U.S.C. § 1396a(bb), as these provisions vest the FQHCs with a federal right to proper reimbursement.

The Medicaid scheme

Loiza operates a community "health center" under the Public Health Service [PHS] Act, 42 U.S.C. § 254b. Such centers must meet various requirements: most importantly, they must be located in a medically underserved area or serve a medically underserved population. 42 U.S.C. § 254b(a)(1). They must also provide services to Medicaid recipients. See 42 U.S.C. § 254b(k)(3)(E). As a "health center," Loiza is eligible to receive, and has received, federal grant funds under section 330 of the Public Health Service Act. 42 U.S.C. § 254b.

Loiza alleges that the Commonwealth has failed to properly compensate the plaintiff health centers for their treatment of Medicaid patients. Some elaboration of the Medicaid scheme is needed to understand the dispute. The Medicaid program, which was begun in 1965, is jointly supported with federal and state funds and directly administered by state governments: the purpose is to provide medical assistance to indigent families with dependent children, as well as indigent disabled, blind, and aged individuals. 42 U.S.C. § 1396 et seq.; see Rabin v. Wilson-Coker, 362 F.3d 190, 192 (2d Cir. 2004). The Commonwealth of Puerto Rico is such a state for Medicaid purposes, 42 U.S.C. § 1301(a)(1), and for these purposes we refer to it as a state. A state need not

participate in Medicaid, but once a state decides to participate, it must comply with all federal requirements.

One such federal requirement is that a state must provide, as a part of its Medicaid plan, certain types of health services. 42 U.S.C. § 1396a(a)(10). For example, a state must provide "Federally-qualified health center services." 42 U.S.C. § 1396a(a)(10)(A); 42 U.S.C. § 1396d(a)(2)(C). Such services can, by statutory definition, only be provided by "Federally-qualified health centers" (FQHCs). Loiza is a FQHC because it is eligible to receive grants under section 330 of the Public Health Service Act (most importantly, it serves a medically underserved area). 42 U.S.C. § 254b.

Federal law regulates in great detail the ways in which FQHCs receive payment for the services that they provide to Medicaid patients. The special provisions on FQHC reimbursement reflect the important public health role that these centers play. The FQHC reimbursement scheme has changed several times, most recently on January 1, 2001. The system in place between 1989 and 2000 required that FQHCs be reimbursed for "100 percent . . . of [each FQHC's] costs which are reasonable." 42 U.S.C. § 1396a(a)(13)(C) (repealed 2000).

A new system, which relieved centers of having to supply new cost data every year, was put in place after fiscal year 2000. The new system, which is the focus of this action, is referred to

as the prospective payment system (PPS).  The first step is to calculate each center's total cost of providing Medicaid services for two years, 1999 and 2000.  FQHCs must submit detailed cost reports and only "reasonable" costs can be considered.  42 U.S.C. § 1396a(bb)(2).  The total reasonable costs for 1999 and 2000 are then divided by the total number of visits by Medicaid patients in those two years to obtain an average per visit rate.  Id.  This 1999 and 2000 per visit cost data becomes the baseline cost data that will be used for all future years.  42 U.S.C. § 1396a(bb)(2)-(3).

To obtain a center's reimbursement for fiscal year 2001, this per visit average cost from 1999 and 2000 is multiplied by the number of Medicaid visits in fiscal year 2001.  42 U.S.C. § 1396a(bb)(2).  In subsequent years (fiscal year 2002, etc.), the per visit average cost of 1999 and 2000 is first multiplied by a Medicare Economic Index ("MEI" -- a standard measure of inflation) and then multiplied by the number of visits in those succeeding years.[2]  The amount of the per visit payment thus automatically rises every year, because of the MEI, and costs are no longer re-audited every year as the 1999 and 2000 per visit cost figures are the baseline for the calculation.  New visit data, of course, is necessary for each new year.  A state may only deviate from the

_____

[2]The formula is slightly more complex because changes in the scope of services provided can be used to adjust the payments, both in fiscal year 2001 and thereafter.  42 U.S.C. § 1396a(bb)(2), (3).

-6-

very specific payment methodology of the PPS if the FQHC involved gives its consent and there is no reduction in total payments made as compared to the PPS method. 42 U.S.C. § 1396a(bb)(6). No such consent to deviate was given by Loiza here.

The system of states reimbursing FQHCs for their Medicaid costs is complicated considerably by the fact that many states -- including the Commonwealth of Puerto Rico -- use a managed care approach to running their Medicaid system. Essentially, the state Medicaid agency contracts with managed care organizations (MCOs, commonly known as health maintenance organizations or HMOs) to arrange for the delivery of health care services to Medicaid patients. The state generally pays each MCO a fixed monthly sum per Medicaid patient assigned to the MCO; in return, the MCO agrees to provide all covered services to the individual. The MCO turns a profit if its costs are less than the fixed monthly sum, and has a loss if its costs are more than the fixed monthly sum. Unless the MCO actually owns hospitals and clinics, it then must contract with various health care providers, including FQHCs, in order to actually provide services to Medicaid patients.

A problem arises when the MCO contract with the FQHC gives the FQHC less than the amount of compensation it is supposed to get according to the detailed per visit PPS reimbursement method outlined above. Congress has dealt with this problem by providing that states must pay FQHCs a supplemental or wraparound payment to

make up the difference between what the MCO is paying the FQHC and what the FQHC is entitled to via the detailed PPS methodology.[3] 42 U.S.C. § 1396a(bb)(5). Such wraparound payments must be made at least three times each year. Id. Thus, even in a managed care system like Puerto Rico's, FQHCs are protected and must receive reimbursements equal to the PPS methodology that Congress has laid out. Since Puerto Rico uses a managed care system, FQHCs will get Medicaid payments from two sources: first, the MCO, and second, a wraparound payment from the Commonwealth.

Facts as to Puerto Rico's compliance

This case arose because the Commonwealth did not establish a PPS promptly after January 1, 2001, when the system came into effect. In fact, no wraparound payments at all were made by the Commonwealth to FQHCs before the federal court, and a Commonwealth court in a related case, recently ordered relief.

The commencement of a related state court case by various Puerto Rican FQHCs against the Commonwealth on May 10, 2002 apparently led the Commonwealth to begin developing a PPS, but not to make payments. After the commencement of that case, the Commonwealth filed amendments to its state Medicaid plan adding the PPS methodology as laid out in the statute, 42 U.S.C. § 1396a(bb), to its plan without adding much, if any, additional detail beyond

---

[3]Congress created the wraparound requirement for FQHCs in 1997, several years before the PPS for FQHCs was statutorily created. See 42 U.S.C § 1396a(a)(13)(C) (repealed 2000).

what is stated in the statute itself.  These amendments were approved by the federal government on April 8, 2003.

In July 2003, the Commonwealth's Department of Health hired an auditor, Ramon L. Marrero Rosado ("Marrero"), to assist it in actually performing the calculations that would be necessary to pay its obligations under the PPS.  Marrero produced a spreadsheet containing the data he gathered and calculations he performed, dated November 25, 2003.

Marrero attempted to calculate some of the basic data needed.  He assembled data from government agencies and MCOs on the total number of patients seen by each of the Puerto Rico FQHCs in 1999 and 2000.  For two reasons, this was not equivalent to the number of Medicaid visits data required by federal law.  First, it included all patients, not just those using Medicaid.  To adjust for this, Marrero multiplied the total number of patients by another number, the percentage of patients attended to who are "purely Medicaid."  It is unclear exactly what the source of this "purely Medicaid" data is or what precisely it means.  Second, the PPS statute speaks of a per visit rate, not a per patient rate.  Marrero testified to the federal court that he could not correct for this error because of limitations in the data.  But he stated that the per visit number could be calculated if better data were obtained.

Marrero also produced data on the Medicaid costs of the various FQHCs, including Loiza. Total cost data for 1999 and 2000 was obtained from each of the centers, averaged between the two years, and adjusted slightly for reasons that are unclear. There were no significant adjustments to the cost data for reasonableness; the statutory requirement is that only reasonable costs be used. 42 U.S.C. § 1396a(bb)(2). This total cost data was multiplied by the "purely Medicaid" percentage to obtain data on each center's total Medicaid-related costs. Marrero then subtracted other sources of income for the centers in 1999 and 2000 from these total Medicaid costs. For example, any payments made from the MCOs to the FQHCs in 1999 and 2000 were subtracted. Also, grants made to the centers under section 330 of the Public Health Service Act in 1999 and 2000 were subtracted. The plaintiffs have argued that Marrero acted illegally in subtracting section 330 grants.

Comparing the total costs for 1999/2000 with the total income for those same years, Marrero ultimately came up with a net number. This number was positive for most of the centers, but it was negative for Loiza: $776,626. Marrero represented this as meaning that no wraparound payment was owed to most of the centers -- only Loiza and one other FQHC were actually owed wraparound payments.

Whether the data was correct as to years before 2001 need not concern us. Marrero's calculation is not a correct calculation of the proper wraparound payment for any of the years at issue since the January 1, 2001 establishment of the PPS. The average cost per Medicaid visit for 1999 and 2000 is to be used as the baseline for establishing per visit costs in every subsequent year (multiplied by the MEI after 2001). 42 U.S.C. § 1396a(bb)(2)-(3). However, only these per visit costs are standardized; one still needs new Medicaid visit and MCO payment data for each center for every subsequent year in order to calculate the amount of the wraparound payment due in that given year. Since there is no MCO payment or visit data on the spreadsheet for the years 2001 up to the present (all of the income and visit data is from the 1999 and 2000 periods), wraparound payments for those later years cannot be calculated from Marrero's data. The data on the spreadsheet appears to come closest to accurately calculating the wraparound payments due in 1999 and 2000.

Loiza's Financial Situation

There was testimony on the precarious financial state of Loiza. Jose Orlando Colon Gonzalez ("Colon"), an accountant, testified on March 15, 2004, that Loiza had four sources of funds: "program income" from customers able to make cash payments because of private insurance or other reasons, section 330 grants from the federal government, contractual payments from the MCOs, and

-11-

wraparound payments from the Commonwealth to make up the difference between MCO payments and payments required under the PPS. He testified that program income was only a small portion of the total budget and that the MCOs had not made any payments to Loiza "for the last few months." He further testified that neither Loiza nor any other center had ever received any wraparound payments from the Puerto Rican government. To make matters worse, Loiza was told by the federal government that its section 330 federal grants would be stopped on March 31, 2004, if it did not submit quarterly financial reports for the 2003 fiscal year by that date. Colon stated that Loiza could not afford the audit needed to prepare the reports because it did not have the money to pay for it.

Colon prepared a monthly projected income statement for Loiza for March and April 2004. Expenses exceeded income for each of these two months by substantial margins ($141,067 in April 2004). Colon also testified that even before March 2004, Loiza was already $688,000 behind on its mortgage payments. He stated that the mortgage had been overdue for eight or nine months and that the bank had told Loiza that it was going to begin foreclosure proceedings.

## II.

Procedural background

On May 10, 2002, some thirteen months before this federal action was filed, Loiza and 18 other FQHCs sued the Commonwealth of

-12-

Puerto Rico, the Puerto Rico Secretary of Health, and related parties in a Commonwealth court in San Juan. The complaint alleged that the Commonwealth was not properly making payments under the PPS effective after January 2001 and codified at 42 U.S.C. § 1396a(bb), and in fact that it had not yet created a system to make such payments. The complaint asked that the state court issue a writ of mandamus ordering the Secretary of Health to comply with his duties under the PPS, that it issue a declaratory judgment that the defendants were acting unlawfully, and that it order retroactive damages relief back to October 1, 1997. It did not expressly seek injunctions that future payments be made.

A year and a half later, after the federal action had commenced, the Commonwealth court issued a partial judgment on December 18, 2003. This judgment stated that it was determining two discrete issues related to the controversy. First, "whether or not the [section] 330 funds received by co-plaintiffs" could be deducted "from the total amount of the costs that . . . Puerto Rico has to reimburse the centers." On this issue, the court ruled for the plaintiffs that no deduction of section 330 grants should be allowed because section 330 grants are for special purposes and cannot be used to cover the costs of services to Medicaid patients. Using such section 330 grants to reduce wraparound payments would be defeating the purpose of section 330 grants by essentially

-13-

forcing health centers to use these grants for Medicaid purposes.[4] The second issue the local court addressed in this order was "whether . . . Puerto Rico can establish a 7.5% cap to the administrative expenses incurred by the community centers in providing their [Medicaid] services." Here, the court held that no such 7.5% cap is in the statute or any regulations, and therefore it cannot be used.

Loiza and two of the other FQHCs that had initially filed suit in Commonwealth court had brought suit in federal court on June 6, 2003 and had filed an amended complaint on October 23, 2003, naming as a defendant Secretary Rullan.[5] The amended complaint, brought under 42 U.S.C. § 1983, alleged a failure by the defendant to set up a PPS and make wraparound payments as required by law. The amended complaint asked, as relief, that the defendant's failure to establish a proper PPS and make wraparound payments be declared unlawful, that the defendant be enjoined to

---

[4]The state court heard the Commonwealth's motion for reconsideration of the section 330 part of this partial judgment at a hearing on June 3, 2004; it issued a partial judgment granting the motion for reconsideration on June 16, 2004, notably well after the preliminary injunction being appealed here. After reconsideration it partially reversed course. This new judgment held that some section 330 grant funds actually could be counted as income for purposes of calculating the amount of the wraparound payment under the PPS.

[5]The initial complaint named the Commonwealth of Puerto Rico as a party as well. After the Commonwealth moved to dismiss on Eleventh Amendment immunity grounds, the plaintiffs amended the complaint, removing the Commonwealth as a party and leaving only the Secretary of Health.

establish a PPS, that the court enjoin the defendant to make emergency wraparound payments (based on reasonable approximations) to the plaintiffs until a PPS can be established, and for attorney's fees and costs. Unlike the state court complaint, the amended complaint in federal court did not ask for retroactive monetary relief: such relief would be clearly barred by the Eleventh Amendment, as the Commonwealth has not waived its immunity from this kind of suit in federal court.

All of the plaintiffs in the federal action filed a motion for a preliminary injunction and for summary judgment on January 7, 2004, some six months after the complaint was filed, arguing that the case raised no genuine issues of material fact against them and that the requirements for a preliminary injunction had been met. Before the district court had issued any ruling on that motion, Loiza filed a motion for a temporary restraining order on March 1, 2004. The motion asked that the Secretary be ordered to make an emergency prospective payment, covering Medicaid reimbursement for the first quarter of 2004, due to Loiza's precarious financial position. A magistrate judge to whom the case was referred for recommendation held an evidentiary hearing on that motion on March 15, 2004, at which three witnesses testified.

Loiza argued that emergency relief was appropriate and necessary and that given this need, the district court should use parts of the Commonwealth auditor's (Marrero) calculations, making

-15-

corrections to these in a few places where this was possible and legally required. The district court granted a preliminary injunction to Loiza on March 31, 2004, and essentially adopted Loiza's suggestions on how to modify the auditor's calculations.

The court stated first that the relief being requested posed no Eleventh Amendment immunity problems, given that no retroactive monetary relief was sought and that the Secretary was being sued solely so that he would fulfill prospective duties under federal law. The court also noted that abstention under Younger v. Harris, 401 U.S. 37 (1971), and Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976), was not appropriate because the relief sought in the state case differed from the relief sought in the federal case, inasmuch as retroactive monetary relief was only sought in the state case. Further, Loiza was not seeking to sidestep an unfavorable state court ruling that was on appeal.

Finally, the court considered the four traditional elements of a preliminary injunction -- likelihood of success on the merits, irreparable harm, balance of hardships, and public interest. See McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001). The court held that since the 2001 Medicaid law amendment requiring states to use a PPS and make wraparound payments is clear, as is the Commonwealth's noncompliance with that law (a fact not disputed by the Commonwealth), Loiza demonstrated a strong probability of

-16-

success on the merits.   On the other three prongs, the court stressed that Loiza would have to close its doors if it did not get a prompt payment, which would harm "hundreds of Medicaid patients," while a single quarterly payment made by the Commonwealth would have little effect on the public treasury.

The court's injunction ordered the Secretary to make the first quarter 2004 payment by April 7, 2004.   Specifically, the court adopted the following methodology:

> 2. In computing the first quarter payment, Dr. Rullan shall use the number of Medicaid patients annually served by Loiza during 1999-2000 [according to the auditor's calculations], to wit, 8009.
> 3. The above number shall be multiplied by one fourth (1/4) of the annual total average of Medicaid patient cost incurred by Loiza during 1999-2000 [according to the auditor], to wit, $644.49.   This fraction amounts to $161.17.
> 4. Dr. Rullan, may in turn, deduct any sums paid to Loiza by a managed care entity for the provisions of services to Medicaid during the first quarter of 2004.
> 5. Dr. Rullan shall not deduct [section 330] grant funds Loiza has received under the [PHS] Act.
> 6. If Dr. Rullan cannot . . . rapidly and effectively calculate items 4-5 above, he shall base his payment amount exclusively on the numbers in items 2-3, above.

The court used the government auditor Marrero's methodology and numbers except for two changes.

First, the auditor had subtracted payments made by MCOs to Loiza in 1999/2000 from the amount of the wraparound due; the court did not allow this but would only allow deductions of MCO payments made in the first quarter of 2004.   This was clearly a proper correction.   Second, the auditor deducted funds received by

Loiza as section 330 grants from total costs when determining Medicaid payments due (this is the key issue that was before the local court). The district court, siding with Loiza at this stage, did not allow section 330 grant funds to reduce Medicaid payments. Several other problems with the auditor's methodology were left uncorrected for purposes of this emergency order,[6] given the need for rapid relief.

On April 6, 2004, the Secretary filed a motion with the district court to set aside the district court's March 31, 2004 order granting a preliminary injunction; this was denied on April 20, 2004. This motion was based on a new order from the Commonwealth court in the related local case, filed on March 30, 2004, one day before the federal court order at issue, ordering the payment of $776,626 from the Commonwealth to Loiza within thirty days. The amount that it ordered the Commonwealth to give Loiza is from the "net" column on the auditor Marrero's chart. The district court, in its denial of reconsideration, noted that the Secretary had not given him any information to assess whether the local court order was prospective or retroactive relief, nor had the Secretary shown that he had complied with the local court order. Moreover, the Secretary failed to provide to the district court a certified

---

[6]For example, the auditor's use of a per patient rather than per visit scale was not corrected. As well, the number of patients seen in first quarter 2004 was unavailable, so the auditor's calculation of patients in 1999/2000 was used instead.

English translation of the Commonwealth court order.  A motion to alter or amend the April 20 decision, filed with an English translation of the March 30 Commonwealth court order, was submitted on April 21; this was denied as well on April 22.  It is now clear that the Commonwealth court was ordering a retroactive damages payment in its March 30 order.[7]

Appellate Jurisdiction

Meanwhile, the Secretary had appealed the district court's March 31 preliminary injunction on April 5, 2004.  We have jurisdiction over an interlocutory order granting or denying a preliminary injunction.  28 U.S.C. § 1292(a)(1); Matrix Group Ltd. v. Rawlings Sporting Goods Co., 378 F.3d 29, 32 (1st Cir. 2004).

The Secretary's motion for the district court to "set aside" its March 31, 2004 order should be considered a timely motion to alter or amend the judgment under Fed. R. Civ. P. 59(e).  See Silberstein v. IRS, 16 F.3d 858, 859 (8th Cir. 1994).  If a party files, as here, a notice of appeal after the entry of

_____

[7]One of the filings that the Commonwealth submitted to this court, with a Rule 28(j) letter, stated explicitly that the state court had twice found that the payment it ordered was retroactive and for a different period than the federal preliminary injunction. Further, the federal statute requires wraparound payments to be made at least three times per year, 42 U.S.C. § 1396a(bb)(5)(B), while the Commonwealth's Medicaid plan calls for quarterly payments.  The payment ordered by the state court was for an entire year.  If the state court was ordering prospective relief, it presumably would have ordered only a quarterly payment, like the federal district court, and not a full annual payment.  Finally, the Commonwealth court made none of the corrections that the district court used to update Marrero's 1999/2000 data for 2004.

-19-

judgment but before the entry of orders disposing of timely motions to alter or amend a judgment, the notice of appeal becomes effective after the order disposing of those motions. Fed. R. App. P. 4(a)(4)(B)(i). The Secretary's notice of appeal is effective to give us jurisdiction over the March 31 preliminary injunction order.

However, we have no jurisdiction over the April 20 order or any later orders denying motions to alter or amend the judgment. No new notice of appeal was filed after these orders were entered, as required by Fed. R. App. P. 4(a)(4)(B)(ii). Thus, our jurisdiction is confined to the earlier, March 31, 2004, order. See, e.g., Union Pac. R.R. Co. v. Greentree Transp. Trucking Co., 293 F.3d 120, 126 (3d Cir. 2002); EEOC v. Union Independiente de la Autoridad de Acueductos, 279 F.3d 49, 54 n.5 (1st Cir. 2002); Fant v. New Eng. Power Serv. Co., 239 F.3d 8, 13 n.4 (1st Cir. 2001). But see Beason v. United Techs. Corp., 337 F.3d 271, 274-75 (2d Cir. 2003) (appeals court has discretion to hear at least purely legal arguments raised on a reconsideration motion even if notice of appeal was not amended pursuant to Rule 4(a)(4)(B)(ii)).

To the extent we have any discretion to exercise jurisdiction over these later orders, which is doubtful, we decline to exercise it -- the Secretary did not even reference those later orders in his brief. And even if we had discretion and chose to assume jurisdiction over these later orders, it would not change

the result here, because as we have already noted, the Commonwealth local court payment ordered on March 30, 2004 (the basis for the motions) was retroactive and thus for a different period than the district court's order of prospective relief.

On appeal, the Secretary raises three arguments: 1) the district court should have abstained from hearing the case,[8] 2) Loiza cannot bring a cause of action under 42 U.S.C. § 1983 to enforce the Medicaid provision at issue, 42 U.S.C. § 1396a(bb), and 3) granting the preliminary injunction was otherwise inappropriate. We address these points in turn.

**III**.

Abstention

Ordinarily, our review of whether a preliminary injunction has been properly granted is for abuse of discretion. See Brooks v. N.H. Supreme Court, 80 F.3d 633, 636-37 (1st Cir. 1996). On the abstention issue, however, our review is necessarily controlled by the precise abstention doctrine at issue. Id. at 637. Younger abstention is mandatory if its conditions are met, and our review of whether these have been met is de novo. Esso Standard Oil Co. v. Cotto, 389 F.3d 212, 217 (1st Cir. 2004); Brooks, 80 F.3d at 637. Decisions whether to grant or deny abstention under Colorado River are reviewed for abuse of

---

[8]The Secretary has not argued that either the res judicata or Rooker-Feldman doctrines apply to this case.

-21-

discretion. KPS & Assocs., Inc. v. Designs by FMC, Inc., 318 F.3d 1, 10 (1st Cir. 2003).

The Supreme Court has identified certain discrete types of abstention. See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716-17 (1996) (listing the several types of abstention). These varieties are not "rigid pigeonholes into which federal courts must try to fit cases." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 n.9 (1987); see also Cruz v. Melecio, 204 F.3d 14, 23 (1st Cir. 2000). But the categories do matter: they are "carefully defined," New Orleans Public Service, Inc. (NOPSI) v. Council of New Orleans, 491 U.S. 350, 359 (1989), and the general rule, unless a case falls into one of those exceptions, is that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976).

Younger abstention

Here, the Secretary hangs his hat on the type of abstention identified in Younger v. Harris, 401 U.S. 37 (1971). Younger held that abstention was required where a plaintiff who was defending criminal charges in state court sought to get the federal court to enjoin the ongoing state criminal proceedings. Id. at 53-54. Younger is grounded in notions of comity: the idea that the state courts should not, in certain circumstances, be interfered with. See Huffman v. Pursue, Ltd., 420 U.S. 592, 601, 603-04

-22-

(1975).  For at least two reasons, the abstention principle announced in Younger does not apply to this case.

First, the ongoing state proceeding involved here is not the proper type of proceeding to require adherence to Younger principles.  Younger itself occurred within the context of a criminal state proceeding.  It has expanded beyond that context, however.  "[C]ertain types of state civil proceedings" are also subject to Younger abstention.  Quackenbush, 517 U.S. at 716-17.  The Supreme Court has extended abstention to two types of state civil actions.  See NOPSI, 491 U.S. at 367-68.

First and most importantly, Younger has been extended to some quasi-criminal (or at least "coercive") state civil proceedings -- and even administrative proceedings -- brought by the state as enforcement actions against an individual.  Maymo-Melendez v. Alvarez-Ramirez, 364 F.3d 27, 31-32, 34 (1st Cir. 2004) (applying Younger principles to state administrative disciplinary proceeding of horse trainer); see, e.g., Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432, 434-35 (1982) (Younger abstention appropriate where plaintiff sought to enjoin ongoing state administrative attorney disciplinary proceedings); Moore v. Sims, 442 U.S. 415, 423 (1979) (Younger abstention appropriate in context of state child removal proceedings due to allegations of child abuse); Trainor v. Hernandez, 431 U.S. 434, 444 (1977) (Younger applies to state proceeding to recover

-23-

fraudulently obtained welfare payments); Huffman, 420 U.S. at 603-05 (Younger abstention appropriate where plaintiff challenged ongoing state civil nuisance proceedings); Esso Standard Oil Co., 389 F.3d at 217-18 (using Younger to require abstention in case where environmental board brought state administrative proceedings against gasoline station owner seeking to fine it).

A second situation where Younger abstention has been seen as appropriate in civil cases is in those situations uniquely in furtherance of the fundamental workings of a state's judicial system. Middlesex County, 457 U.S. at 432-33; see Pennzoil, 481 U.S. 1, 13 (1987) (Younger extends to challenge to post-judgment appeal bond); Juidice v. Vail, 430 U.S. 327, 335-36 (1977) (Younger applies to state's enforcement of civil contempt proceedings). It is unclear exactly how far this second rationale extends, although it is related to the coercion/enforcement rationale.[9]

---

[9]Juidice and Middlesex County were both coercive enforcement cases brought by the state against an individual; they simply happened to involve, as well, fundamental interests of the state's judicial system. Even the Supreme Court's furthest extension of the type of proceedings to which Younger applies, in Pennzoil Co., involved this sort of coercive context. Although the underlying state action involved two private parties, Texaco lost the case, faced an $11 billion judgment, and was forced under Texas law to either pay the judgment immediately, before appeal, or put up a huge bond at least equal to the amount of the judgment. 481 U.S. at 4-5. Texaco brought suit in federal court to challenge those bond provisions: it was the "importance to the States of enforcing the orders and judgments of their courts" that was sufficient to bring Younger considerations into play. Id. at 13. Texaco's challenge involved a "challenge[] to the processes by which the State compels compliance with the judgments of its courts." Id. at 13-14.

Neither of the two core rationales that the Supreme Court has used in extending Younger to certain civil proceedings applies here. This is not an enforcement proceeding brought by the state or an agency against Loiza; in fact Loiza filed suit against the Secretary in order to force the Commonwealth to fulfill its federal statutory obligations. Nor are the fundamental workings of the state's judicial system (like its contempt process or method of enforcing judgments) put at risk by the relief asked of the federal court. As well, the Supreme Court has made it clear that it has never "remotely suggest[ed]" that every pending state proceeding between a state and a private plaintiff justifies abstention if that private plaintiff then sues the state in federal court. Moore, 442 U.S. at 423 n.8.

The case is close to New Orleans Public Serv., Inc. (NOPSI) v. Council of New Orleans, 491 U.S. 350 (1989), where the Supreme Court refused to abstain on Younger grounds. NOPSI, a public utility, sought a rate increase from the New Orleans City Council due to increased costs. When such an increase was denied, NOPSI filed suit both in federal district court and in state court, in both instances seeking to have the Council order set aside and the Council enjoined to approve a rate increase. Id. at 355-58. The Supreme Court held that Younger abstention did not apply to this type of state proceeding, which was a mere "state judicial proceeding reviewing legislative or executive action," because

-25-

"[s]uch a broad abstention requirement would make a mockery of the rule that only exceptional circumstances" justify abstention. Id. at 368. Perhaps, the Court noted, in some cases a state administrative enforcement proceeding could be seen as the proceeding to which Younger attached, with the state court proceeding merely serving as a continuation of this administrative enforcement proceeding. Id. at 368-69; see also Maymo-Melendez, 364 F.3d at 35. But such a theory could not work in NOPSI, where the ratemaking before the City Council was not a judicial but rather a legislative proceeding. 491 U.S. at 371.

Here, the state court action, like that in NOPSI, is judicial review of executive action, rather than an enforcement proceeding. As well, there was no administrative enforcement proceeding before the Commonwealth health agency that triggered the review. In fact there was no administrative proceeding at all involving Loiza; the state and federal challenges are to the Secretary of Health's failure to implement a PPS, as federal law requires. The state proceedings here do not trigger Younger abstention requirements.

For a second (and somewhat related) reason as well, Younger abstention is inappropriate in this case. Younger applies only when the relief asked of the federal court "interfere[s]" with the state proceedings. See Quackenbush, 517 U.S. at 716. In Younger itself, the "interference" was the attempt to enjoin the

-26-

pending state criminal proceeding from going forward. See Younger, 401 U.S. at 41. The principle, of course, is somewhat broader: interference also clearly exists where the plaintiff is seeking a declaratory judgment that a prosecution, or the statute serving as its basis, is illegal or unconstitutional. See Samuels v. Mackell, 401 U.S. 66, 72 (1971). Interference is thus usually expressed as a proceeding that either enjoins the state proceeding or has the "practical effect" of doing so. See, e.g., Gilbertson v. Albright, 381 F.3d 965, 977-78 (9th Cir. 2004).

There is no interference with the state court proceedings in this case. The federal injunction that Loiza obtained in federal court is an injunction to make the state Medicaid agency perform certain acts required by federal law; it is not an injunction that would stop the state court from proceeding independently against the state Medicaid agency as well, nor is it inconsistent with any of the Commonwealth court orders. The Commonwealth court relief sought concerned the full creation of a PPS and an accounting of sums due. The Commonwealth court issued a December 18, 2003 partial judgment stating that section 330 grant funds could not be deducted from PPS payments (this was later partially reversed, but only after the federal preliminary injunction had been issued). The federal court issued an order granting emergency, interim relief to Loiza in a way that was

consistent with the earlier state court partial judgment because it also did not allow section 330 grant funds to be deducted.

Normal res judicata effects of federal actions on state actions -- which are possible here -- are of course not enough to trigger <u>Younger</u>. The Court noted in <u>NOPSI</u> that the federal proceeding "may well affect, or for practical purposes pre-empt, a future -- or, as in the present circumstances, even a pending -- state-court action," yet still held <u>Younger</u> abstention inappropriate. <u>NOPSI</u>, 491 U.S. at 373. Another way of stating this is that the mere possibility of inconsistent results in the future is insufficient to justify <u>Younger</u> abstention. This must be the rule, otherwise the principles of <u>Colorado River</u>, which normally apply in the circumstances of parallel federal and state litigation, would be overrun by the <u>Younger</u> doctrine.

<u>Colorado River abstention</u>

Except in the very limited instances where some other form of abstention (such as <u>Younger</u>) applies, abstention of the federal courts in cases involving parallel federal and state proceedings is only appropriate in the "exceptional" circumstances laid out in <u>Colorado River Water Conservation Dist.</u>, 424 U.S. at 818-20.

Given the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," and absent the "weightier considerations" that animate the other abstention

-28-

doctrines, the circumstances permitting abstention under Colorado River for reasons of "wise judicial administration" are quite "limited" and indeed "exceptional." Id. at 818. "Only the clearest of justifications will warrant dismissal." Id. at 819; see also Currie v. Group Ins. Comm'n, 290 F.3d 1, 10 (1st Cir. 2002) ("There must be some extraordinary circumstances" in order for a federal court to abstain on Colorado River grounds). Thus, the district court's discretion whether to dismiss a case on Colorado River grounds should be heavily weighted against dismissal. KPS & Assocs., Inc., 318 F.3d at 10.

We have developed a list of factors -- which is not meant to be exclusive -- for when Colorado River abstention might be appropriate. Courts have considered the following:

> (1) whether either court has assumed jurisdiction over a res; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

Id. No one factor is meant to be determinative, but rather courts must make a "carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise." Colorado River, 424 U.S. at 818; see Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 16 (1983); KPS & Assocs., 318 F.3d at 10.

-29-

No factor weighs strongly in favor of abstention here. It is true that the state case was filed before the federal case. However, the question of priority was meant to be looked at in a "pragmatic, flexible manner[,] with a view to the realities of the case at hand" and should focus on how much "progress has been made in the two actions." Moses H. Cone, 460 U.S. at 21. Here, the state court case has been moving quite slowly. The relief granted here by the federal court has far more limited purposes and can be carried out far more quickly: it is designed solely to provide an interim prospective payment to Loiza while a comprehensive PPS is being created.

Also, we note that the federal action was not filed or pursued as a reaction to an adverse state court action, which would be a factor that weighs heavily in favor of abstention. See Cruz, 204 F.3d at 23-24. The partial state judgment issued on December 18, 2003, was, in fact, highly favorable to Loiza.

There are other crucial factors that weigh against abstention here. This case involves the interpretation of a complicated area of federal law (Medicaid); there appear to be no state law issues. There is no reason to defer to the state court's interpretation of the legal issues involved. See Currie, 290 F.3d at 11 (stay of federal action on Colorado River grounds when case involved complicated state law issues that, if decided in a certain way by state courts, might resolve the federal action). Moreover,

Loiza and the other FQHCs had an entirely reasonable explanation for why they would want to file actions simultaneously in federal and state courts. Because of Eleventh Amendment immunity, claims for retroactive compensation can only be filed in Puerto Rico Commonwealth court. It is true that prospective relief also could have been sought in the Commonwealth courts. However, it is reasonable for Loiza to want the federal courts to devise prospective relief, given the federal courts' greater familiarity with the Medicaid Act.

The district court did not abuse its discretion in refusing to dismiss or stay the claim on Colorado River grounds.

**IV.**

Section 1983

The Secretary next argues that there is no cause of action to enforce this provision of the federal Medicaid law under 42 U.S.C. § 1983. Not so; a § 1983 action does lie for an FQHC to enforce the Secretary's obligation to make wraparound payments under 42 U.S.C. § 1396a(bb).

Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of any "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Not all violations of federal law give rise to § 1983 actions: "[the] plaintiff must assert the violation of a federal right, not merely a violation of federal law." Blessing v.

-31-

Freestone, 520 U.S. 329, 340 (1997) (emphasis in original). Such a right must be "unambiguously conferred" by the statutory provision at issue. Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002).

The Supreme Court, in Blessing, has laid out a three-part test to act as guidance in determining whether a provision creates a "right" that is enforceable under § 1983: 1) whether Congress intended that the provision in question benefit the plaintiff, 2) whether the right supposedly protected by the statute is vague and amorphous so that its enforcement would strain judicial competence, and 3) whether the provision unambiguously imposes a binding obligation on the States. See Blessing, 520 U.S. at 340-41. This test is merely a guide, however, as the ultimate inquiry is one of congressional intent. See Bryson v. Shumway, 308 F.3d 79, 88 (1st Cir. 2002). Gonzaga tightened up the Blessing requirements. It did not precisely follow the Blessing test but rather relied on several somewhat different factors in determining whether a right existed: whether the provision contains "rights-creating language," whether the provision had an aggregate as opposed to an individualized focus, and the other sorts of enforcement provisions that Congress has provided for. See Gonzaga, 536 U.S. at 287-90.[10]

---

[10]We apply the more recent analysis used in Gonzaga rather than the Blessing test. But it is evident from our analysis that the three factors in the Blessing test are all met: Congress did intend for the provision to benefit Loiza as a FQHC, the provision is not unduly vague or amorphous, and the provision does bind the states.

We start by considering post-Gonzaga precedent in this circuit determining whether Medicaid provisions are enforceable under § 1983. In Bryson, we held that a provision, 42 U.S.C. § 1396a(a)(8), stating that state Medicaid plans must provide that medical assistance "shall be furnished with reasonable promptness to all eligible individuals" was enforceable by Medicaid recipients under § 1983. 308 F.3d at 88-89. We utilized the Blessing test and noted that the provision included the benefitted class, "eligible individuals," within its terms, that the provision was not vague, and that the "shall" language was intended to bind the states. Id.

On the other hand, in Long Term Care Pharmacy Alliance v. Ferguson, 362 F.3d 50 (1st Cir. 2004), this court held that a different provision, 42 U.S.C. § 1396a(30)(A), was not enforceable by a group of Medicaid providers suing for higher reimbursement rates under § 1983. The provision states that the state plan must

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30)(A). The provision contained no "rights-creating language," identified no "discrete class of

beneficiaries," focused on the state as a regulated entity rather than any individuals protected, and set out broad, general goals. See Ferguson, 362 F.3d at 56-57.[11]

The provision that Loiza is seeking to enforce is the wraparound requirement for FQHCs, 42 U.S.C. § 1396a(bb)(5), which reads as follows:

> **(A) In general**
> In the case of services furnished by a [FQHC] . . . pursuant to a contract between the center or clinic and a managed care entity . . ., the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under [the earlier paragraphs describing the PPS payment system] of this subsection exceeds the amount of the payments provided under the contract.
> **(B) Payment schedule**
> The supplemental payment required under subparagraph (A) shall be made pursuant to a payment schedule agreed to by the State and the [FQHC] . . ., but in no case less frequently than every 4 months.

Id. This provision meets the tests laid out by the Supreme Court for determining whether a "right" was created that is enforceable under § 1983.

The provision mentions a specific, discrete beneficiary group within the statutory text -- the FQHCs. It is "phrased in

_____

[11]In the same opinion, however, the court assumed that a different provision, 42 U.S.C. § 1396a(a)(13)(A) (State plan should provide "for a public process for determination of rates of payment under the plan for hospital services, nursing facility services, and services of intermediate care facilities"), was enforceable under section 1983 because it contained "rights-creating language" and was narrowly written with a discrete class of beneficiaries in mind. Ferguson, 362 F.3d at 56-57.

terms of the persons benefitted." Gonzaga, 536 U.S. at 284 (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 692 n.13 (1979)); see also Bryson, 308 F.3d at 88. The precise language at issue, that the state plan "shall provide for payment to the center . . . by the State of a supplemental payment," 42 U.S.C. § 1396a(bb)(5)(A), is rights-creating language because it is mandatory and has a clear focus on the benefitted FQHCs, rather than the regulated states. See Gonzaga, 536 U.S. at 279, 287 (language stating that "[n]o funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records" was not rights-creating because the "focus is two steps removed from the interests of individual students and parents"); see also Rabin v. Wilson-Coker, 362 F.3d 190, 201-02 (2d Cir. 2004) (finding rights-creating language in provision, 42 U.S.C. § 1396r-6, stating that "each State plan approved under this subchapter must provide that each family which was receiving [AFDC] in at least 3 of the 6 months immediately preceding the month in which such family becomes ineligible for such aid . . ., remain eligible for assistance under the plan . . . during the immediately succeeding 6-month period").

As well, the statute speaks in individualistic terms, rather than at the aggregate level of institutional policy or practice. Nothing like the "policy or practice" language present

in the provision interpreted in Gonzaga exists here.  See Gonzaga, 536 U.S. at 288; see also Rabin, 362 F.3d at 201.  The mere fact that all the Medicaid laws are embedded within the requirements for a state plan does not, by itself, make all of the Medicaid provisions into ones stating a mere institutional policy or practice rather than creating an individual right.  See 42 U.S.C. § 1320a-2 ("In an action brought to enforce a provision of this chapter [which includes the Medicaid statutes], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan."); Rabin, 362 F.3d at 201-02.

Additionally, the commands of § 1396a(bb) are written in highly specific terms.  The language here is extremely clear and narrow: it tells a state exactly how to calculate the wraparound and it gives a maximum duration (4 months) between wraparound payments.  There is thus less danger of disparate outcomes or of a right being too vague to easily enforce, as noted in Ferguson, 362 F.3d at 58.

One circuit court, albeit without discussing the issue, has recently allowed a § 1983 action to go forward based on violations of 42 U.S.C. § 1396a(bb).  See Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 136 (2d Cir. 2002).[12]  We conclude that

---

[12]As well, several courts in other circuits, after Gonzaga, have allowed actions to go forward under § 1983 using similar provisions of the Medicaid law.  See, e.g., Rabin, 362 F.3d at 201-

a private action can be brought by an FQHC under section 1983 to enforce 42 U.S.C. § 1396a(bb).

## V.

We finally consider whether the district court abused its discretion in determining that the traditional requirements for a preliminary injunction had been met and ordering relief. Our review of approval or denial of a preliminary injunction is for abuse of discretion. See McClure v. Galvin, 386 F.3d 36, 41 (1st Cir. 2004). Many issues have not been challenged on appeal. For example, the Secretary does not argue that the district court's refusal to allow the deduction of section 330 grant funds was error, and we do not address this issue despite Loiza's urging that

---

02; S.D. v. Hood, 391 F.3d 581, 602-06 (5th Cir. 2004) (considering 42 U.S.C. § 1396a(a)(10)(A)(i): "A State plan must provide for making medical assistance available, including at least the care and services listed in [certain paragraphs], to all individuals [who meet certain eligibility criteria]."); Gean v. Hattaway, 330 F.3d 758, 772-73 (6th Cir. 2003) (considering 42 U.S.C. § 1396a(a)(3): A state plan must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness"). The Seventh Circuit, in Bruggeman v. Blagojevich, 324 F.3d 906, 911 (7th Cir. 2003), refused to allow a § 1983 action to go forward under 42 U.S.C. § 1396a(a)(19), which says that state Medicaid plans must "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined . . . in a manner consistent with simplicity of administration and the best interests of the recipients." That provision is far more general than the one at issue here, and unlike the provision here is written with a policy bent that does not demonstrate an intent to directly benefit any discrete group.

we reach it.  We consider only those challenges raised by the Secretary on appeal.

Traditionally, the test for a preliminary injunction has four factors: 1) a likelihood of success on the merits, 2) irreparable harm to the plaintiff should preliminary relief not be granted, 3) whether the harm to the defendant from granting the preliminary relief exceeds the harm to the plaintiff from denying it, and 4) the effect of the preliminary injunction on the public interest.  See, e.g., Matrix Group Ltd. v. Rawlings Sporting Goods Co., 378 F.3d 29, 33 (1st Cir. 2004).

Likelihood of success on the merits

The Secretary makes two broad-based challenges to Loiza's likelihood of prevailing on the merits.  First, he argues that Loiza has not shown a likelihood of success on the merits because the relief sought by Loiza in fact corresponds to the period 2000-2003, and thus constitutes retroactive compensation barred by the Eleventh Amendment.  Edelman v. Jordan, 415 U.S. 651, 668-71 (1974).  This statement is false: the plaintiffs' complaint in the federal case seeks only prospective injunctive and declaratory relief, not damages for past wrongs, and the district court's preliminary injunction only covers the prospective period.

Second, the Secretary argues that he had already established the methodology of the PPS plan, largely as a result of the parallel state case, and so the federal case was moot.  See,

-38-

e.g., Granite State Outdoor Adver., Inc. v. Town of Orange, 303 F.3d 450, 451 (2d Cir. 2002) ("In order to establish that there is a likelihood of success on the merits, . . . the movant must establish that the case is not likely to be moot."). Not so. The Secretary's own witness (the auditor Marrero) admitted that no wraparound payments had ever been made by Puerto Rico to Loiza or the other FQHCs. The Commonwealth essentially has admitted that it has not been in compliance with federal Medicaid law. It is undisputed that Loiza had not yet received the first quarter 2004 wraparound payment at the time of the preliminary injunction.

Irreparable injury, balance of harms, public interest

Loiza has adequately shown the presence of irreparable harm if preliminary relief were not granted. "Irreparable injury" in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy. See, e.g., C. Wright et. al., 11A Federal Practice & Procedure § 2948.1, at 149 (2d ed. 1995) ("[I]f a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief."); D. Dobbs, 1 Law of Remedies § 2.11(2), at 260 (2d ed. 1993). Loiza adequately demonstrated that sort of irreparable harm here. Its witness, the accountant Colon, testified that Loiza had fallen eight or nine months behind on its mortgage and that foreclosure proceedings were about to

-39-

begin.  See, e.g., Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (1975) (threat of substantial loss of business and certainly bankruptcy qualified as the sort of irreparable harm needed to support preliminary injunction).

The Secretary argues, however, that Loiza has not shown any causation between its financial woes and the Secretary's failure to pay wraparound.  This too is incorrect.  Colon testified that the FQHCs' sources of revenue were fourfold: program income from paying customers or those with private insurance, MCO payments, the wraparound, and section 330 revenue.  There was further testimony that program income was not substantial, that MCO payments were generally well below FQHC costs, and that the MCOs had not been making payments to Loiza for the past few months.  It is not unreasonable to jump from here to a conclusion that the lack of wraparound payments -- which are supposed to cover for any deficiencies in MCO payments -- was a key cause of Loiza's financial difficulties.

Finally, on the balance of harm and public policy prongs, we see nothing unreasonable in the district court's finding that forcing the Commonwealth government to make a prospective interim payment to a single FQHC would have no substantial impact on the Commonwealth fisc, particularly as much of the Medicaid money is ultimately federal.  The Secretary argues that granting this relief has interfered with the PPS that he is in the process of

establishing. However, the granting of an interim payment, using a rough methodology based on the work of the state's own expert while a permanent PPS is being established, can hardly be considered substantial interference with the creation of that permanent system. Finally, we fully agree with the district court's point that any shut down of Loiza would adversely affect hundreds of Medicaid patients.

There was no abuse of discretion in the granting of this preliminary injunction.

## VI.

The district court's grant of the March 31, 2004 preliminary injunction in Loiza's favor is **affirmed.** Costs are awarded to Loiza.